

# SUPREME COURT OF MISSOURI
## en banc

| | | |
|---|---|---|
| R.M.A., | ) | *Opinion issued June 10, 2025* |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | No. SC100694 |
| | ) | |
| BLUE SPRINGS R-IV SCHOOL | ) | |
| DISTRICT, | ) | |
| | ) | |
| Respondent. | ) | |

### APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY
The Honorable Cory L. Atkins, Judge

R.M.A. appeals the circuit court's judgment sustaining Blue Springs R-IV School District's ("the School District") motion for judgment notwithstanding the verdict ("JNOV") or, in the alternative, the School District's motion for new trial, following a jury verdict in R.M.A.'s favor on a claim for relief under the public accommodation provision of the Missouri Human Rights Act ("MHRA"), section 213.065.[1] R.M.A. raises three points on appeal, alleging the circuit court erred in sustaining the JNOV motion or, alternatively, the motion for new trial, and alleging the circuit court

---

[1] All statutory references are to RSMo 2000, unless otherwise indicated.

erroneously limited the jury instructions.[2]  Because R.M.A. failed to make a submissible case for discrimination on the basis of R.M.A.'s male sex as pleaded and instructed, the circuit court's judgment is affirmed.

**Factual and Procedural Background**

This case arises from the same litigation as *R.M.A. ex rel. Appleberry v. Blue Springs, R-IV School District*, 568 S.W.3d 420 (Mo. banc 2019) ("*R.M.A. I*").  R.M.A. was a minor child attending public school in the School District at the onset of this litigation.  R.M.A. is a female to male transgender individual who, as alleged in the petition, "was born as a female child and transitioned to living as a male in September 2009 while attending fourth grade in the [School District]."  R.M.A. petitioned for, and was granted, a change of name to a name traditionally given to males in 2010.  In 2014, R.M.A. sought and obtained an amended birth certificate reflecting the name change and changing R.M.A.'s sex designation from female to male.[3]  R.M.A. requested permission to use the male-designated restrooms and locker room facilities during the 2013-2014 and 2014-2015 school years – during eighth and ninth grade, respectively – but the School District denied the request.

---

[2] The School District also raised two points on appeal, alleging evidentiary errors justifying a new trial.  This Court will not review those points, however, because they are not necessary to the disposition.

[3] Section 193.215.9 states: "Upon receipt of a certified copy of an order of a court of competent jurisdiction indicating the sex of an individual born in this state has been changed by surgical procedure and that such individual's name has been changed, the certificate of birth of such individual shall be amended."

In October 2014, R.M.A. filed a charge of discrimination with the Missouri Commission on Human Rights ("Commission") alleging public accommodation discrimination on the grounds of sex. In July 2015, the Commission issued a notice of right to sue. R.M.A. filed a petition against the School District in October 2015, alleging "R.M.A.'s legal sex is 'male'" and R.M.A. "was discriminated against in his use of a public accommodation on the grounds of his sex" in violation of section 213.065.

The School District moved to dismiss R.M.A.'s petition for failure to state a claim upon which relief could be granted, asserting, *inter alia*, the public accommodation protection in section 213.065 does not cover claims based on gender identity. The circuit court sustained the motion and entered judgment dismissing R.M.A.'s petition with prejudice. R.M.A. appealed. In *R.M.A. I.*, this Court reviewed whether R.M.A.'s allegations matched "the elements of a recognized cause of action." *Id.* at 424 (quoting *Bromwell v. Nixon*, 361 S.W.3d 393, 398 (Mo. banc 2012)).[4] This holding did not require "weigh[ing] the factual allegations to determine whether they are credible or persuasive." *Id.*

R.M.A.'s cause of action alleged public accommodation sex discrimination under section 213.065, which requires a plaintiff to plead the following ultimate facts: (1) plaintiff is a member of a protected class; (2) plaintiff was discriminated against in the use of a public accommodation; and (3) plaintiff's membership in a protected class was a

---

[4] "Missouri is a fact-pleading state," and a plaintiff need plead only ultimate facts to sufficiently state a claim. *Matthews v. Harley-Davidson*, 685 S.W.3d 360, 366 (Mo. banc 2024).

contributing factor in that discrimination. *Id.* at 425. From there, reviewing R.M.A.'s petition was "simple and straightforward." *Id.* at 425-26. First, the petition alleged "R.M.A.'s legal sex is male." *Id.* at 427 (internal quotation omitted). Second, R.M.A. alleged that the School District had denied R.M.A. access to the boys' restrooms and locker rooms. *Id.* at 426. Because "[a] school's restrooms and locker rooms constitute public accommodations as defined in section 213.010(15)(e)," R.M.A. sufficiently alleged the School District denied R.M.A. the "full and equal use and enjoyment" of a public accommodation. *Id.* (internal quotation omitted). Finally, R.M.A. pleaded discrimination on "the grounds of his sex." *Id.* (internal quotation omitted). The Court found, therefore, R.M.A. had pleaded the ultimate facts to establish a claim of sex discrimination "[a]t this stage of the proceeding," reversed the circuit court's dismissal of R.M.A.'s petition, and remanded for further proceedings. *Id.* at 428, 430.

Notably, this Court declined to define the term "sex" as used in section 213.065, finding the debate over statutory interpretation was premature given the procedural posture because, at the motion to dismiss stage, all that is required of a plaintiff is to allege the elements in section 213.065. *Id.* at 427 n.7. On remand, R.M.A. did not amend the pleadings. R.M.A. also did not challenge the School District's right to provide separate restrooms on the basis of sex.

R.M.A. proceeded to trial in December 2021. The jury found the School District liable for sex discrimination based on R.M.A.'s "male sex," without being instructed regarding a definition of "sex," and awarded R.M.A. $175,000 in compensatory damages and assessed $4 million in punitive damages against the School District. The circuit

4

court entered its jury trial order and partial judgment attaching and incorporating by reference the jury verdict and indicating it would decide R.M.A.'s requests for attorney fees and equitable relief after the parties submitted additional briefing.

The School District filed a motion for JNOV or, in the alternative, a motion for new trial, alleging R.M.A. failed to make a submissible case for sex discrimination or, alternatively, the jury verdict was against the weight of the evidence. The circuit court sustained the School District's motion for JNOV and conditionally granted a new trial,[5] finding "[t]he sole uncontradicted evidence at trial was that [R.M.A.] was excluded from the male facilities because of his female genitalia."[6]

---

[5] On the same day, but prior to the final judgment sustaining the School District's motion for JNOV, the circuit court amended the judgment in accordance with the jury's verdict, awarding attorney fees but denying equitable relief.

[6] Judge Wilson's dissenting opinion suggests the JNOV must be reversed because it was overruled by operation of Rule 78.06 when the circuit court failed to rule on the motion for JNOV for more than 90 days after it was filed. This is incorrect for two reasons. First, Rule 78.06's time limits do not apply when there is not a final judgment. *Schmidt v. Dart Bein, LC*, 644 S.W.3d 579, 582 n.5 (Mo. App. 2022); *accord Gipson v. Fox*, 248 S.W.3d 641, 644 (Mo. App. 2008). "In other words, unless an appeal lies from a decree or order when it is entered, the decree or order is not a 'judgment' as defined in Rule 74.01(a), and is not a 'judgment' as to which Rules 75.01 and [78.06] apply." *Schmidt*, 644 S.W.3d at 582 n.5 (alteration in original) (quoting *Cupit v. Dry Basement, Inc.*, 592 S.W.3d 417, 424 (Mo. App. 2022)). Here, the circuit court had not yet ruled on R.M.A.'s request for equitable relief, preventing the jury trial order and partial judgment entered in accordance with the jury's verdict from being a final judgment. The time limitation in rule 78.06, therefore, does not apply. Second, even if the first judgment was final, the later judgment would merely be considered "voidable." *State ex rel. Hawley v. Pilot Travels Ctrs., LLC*, 558 S.W.3d 22, 29-30 (Mo. banc 2018). "As such, the circuit court's second judgment, [even if] entered without authority, is nevertheless the operative final judgment unless its validity was properly challenged. Failure to challenge a court's authority to take some action waives a party's right to challenge that action." *Id.* at 30. The parties, therefore, waived their rights to challenge the action by failing to object to the later judgment.

R.M.A. appeals.[7]

## Standard of Review

A JNOV is appropriate when a plaintiff fails to make a submissible case. *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007). A plaintiff fails to make a submissible case when one or more elements of the claim are not supported by the evidence. *Id.* In determining whether there was sufficient evidence to support the jury's verdict, this Court views the evidence in the light most favorable to the jury's verdict, giving evidence consistent with the verdict the benefit of all reasonable inferences and disregarding evidence that conflicts with the verdict. *Id.* A JNOV after a jury verdict is appropriate "only whe[n] there is a complete absence of probative fact to support the jury's conclusion." *Id.*

"Statutory interpretation is an issue of law that this Court reviews de novo." *State v. Johnson*, 524 S.W.3d 505, 510 (Mo. banc 2017) (internal quotation omitted).

## Analysis

Section 213.065 prohibits discrimination in public accommodations "on the grounds of … sex." To make a submissible case of sex discrimination in a public accommodation under the MHRA, a plaintiff must present evidence to support three elements: (1) plaintiff is a member of a class protected under section 213.065.1; (2) plaintiff was discriminated against in the use of a public accommodation; and (3) plaintiff's status as a member of a protected class was a contributing factor in such

---

[7] This Court transferred the appeal and has jurisdiction pursuant to Mo. Const. art. V, section 10.

discrimination. Section 213.065; *R.M.A. I*, 568 S.W.3d at 424-25. To make a submissible case, R.M.A. must have adduced evidence supporting the following findings: (1) R.M.A. is a member of the male sex as pleaded;[8] (2) R.M.A. was denied full and equal use of the male restrooms and locker room facilities in the School District; and (3) R.M.A.'s male sex was a contributing factor in such denial.

*Points I and II: Whether R.M.A. made a submissible case for sex discrimination*

Only the third element is at issue in this case. R.M.A. claims to have made a submissible case for sex discrimination because there was substantial evidence that R.M.A.'s male sex was a contributing factor in the School District's denial of access to the male restrooms and locker rooms. R.M.A. specifically argues the School District's consideration of genitalia is an inherently sex-related basis for discrimination. The School District claims, and the circuit court agreed, the only evidence adduced demonstrated the School District denied R.M.A. use of the male restrooms because of R.M.A.'s *female* sex, rather than *male* sex and, therefore, R.M.A. failed to make a submissible case of discrimination on the basis of *male* sex. This Court agrees.

Although R.M.A. and the dissenting opinions couch the issue as a factual dispute, the claim is dependent on the legal definition of the term "sex" as used by the General Assembly in section 213.065. R.M.A. argues, and the dissenting opinions agree, it is unlawful sex discrimination for a public school district to prohibit R.M.A., a student with female genitalia, from using restrooms and locker rooms reserved for male students. This

---

[8] *R.M.A. I*, 568 S.W.3d at 427 n.7 ("R.M.A. claims discrimination based on his sex and, therefore, must allege he is either male or female.").

novel argument finds no support in the text or legislative history of the public accommodation provisions under the MHRA.

"An issue of statutory interpretation is a question of law, not fact." *Laut v. City of Arnold*, 491 S.W.3d 191, 196 (Mo. banc 2016) (internal quotation omitted). "The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to give effect to that intent if possible, and to consider words used in the statute in their plain and ordinary meaning." *Howard v. City of Kan.* City, 332 S.W.3d 772, 779 (Mo. banc 2011) (internal quotation omitted). "Ascertaining the legislature's intent in statutory language should not involve hypertechnical analysis 'but instead should be reasonable, logical, and should give meaning to the statutes.'" *State v. Milazzo*, No. SC100652, ___ S.W.3d ___, 2025 WL 843662, at *3 (Mo. banc Mar. 18, 2025) (quoting *United Pharmacal Co. of Mo. v. Mo. Bd. of Pharmacy*, 208 S.W.3d 907, 912 (Mo. banc 2006)). "[I]t is not within the Court's province to 'question the wisdom, social desirability, or economic policy underlying a statute as these matters are for the legislature's determination.'" *Turner v. Sch. Dist. of Clayton*, 318 S.W.3d 660, 668 (Mo. banc 2010) (quoting *Winston v. Reorganized Sch. Dist. R-2, Lawrence Cnty., Miller*, 636 S.W.2d 324, 327 (Mo. banc 1982)).

Neither MHRA generally, nor section 213.065 specifically, defines the term "sex." *See* section 213.010. "Absent statutory definition, words used in statutes are given their plain and ordinary meaning with help, as needed, from the dictionary." *Hudson v. Joplin Reg'l Stockyards, Inc.*, 701 S.W.3d 862, 865 (Mo. banc 2024) (internal quotation omitted). The term "sex" refers to "one of the two divisions of organic esp. human

8

beings respectively designated male or female" as well as "the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change, that in its typically dichotomous occurrence is usu[ally] genetically controlled and associated with special sex chromosomes." *Sex, Webster's Third New International Dictionary* (2002).[9] This definition is premised on "sex" as a biological classification of individuals as male or female. Accordingly, the plain and ordinary meaning of "sex" refers to one's biological classification as male or female.[10]

This understanding of unlawful sex discrimination in public accommodations based on biological sex, as the plain meaning from the dictionary directs, is reinforced by many subsequent unsuccessful efforts to amend the MHRA to extend its anti-discriminatory provisions to cover public accommodation discrimination based on sexual

---

[9] The dictionary's definition of "sex" has remained the same since before section 213.065's enactment in 1986. *See Sex, Webster's Third New International Dictionary* (1961); *Sex, Webster's Third New International Dictionary* (1993); *see also Sex, American Heritage Dictionary* (1976) ("The property or quality by which organisms are classified according to their reproductive functions."); *Sex, Black's Law Dictionary* (6th ed. 1990) ("The sum of the peculiarities of structure and function that distinguish a male from a female organism; the character of being male or female."); *Sex, Webster's Third New International Dictionary* (2002) (same).

[10] R.M.A.'s petition alleged discrimination based on the claim "his legal sex" is "male." This classification and specific phraseology is not consistent with the plain meaning of sex. The term "legal sex" is a misnomer that may be more comparable with the term "gender" and should not be used to analyze the statutory text of public accommodation protections in section 213.065. This Court recognizes the terms "sex" and "gender" have been conflated in the past. *See, e.g.*, *Hill v. Ford Motor Co.*, 277 S.W.3d 659, 666 (Mo. banc 2009); *Doe ex rel. Subia v. Kan. City, Mo. Sch. Dist.*, 372 S.W.3d 43, 52-53 (Mo. App. 2012). Because the public accommodation protections under section 213.065 prohibit discrimination because of "sex," not gender, the term "sex" and the definition of "sex" should be used. *See infra* note 12.

9

orientation and gender identity. In each legislative session since 2019, the General Assembly has considered and rejected proposed amendments to extend section 213.065 to specifically prohibit discrimination in public accommodations on the basis of gender identity and sexual orientation. *See* SB 172 (2019); SB 945 (2020); HB 984 (2021); SB 711 (2022); SB 60 (2023); SB 787 (2024). Between the plain meaning of "sex" under various dictionary definitions and the legislature's refusal to include sexual orientation and gender identity in anti-discrimination legislation specific to public accommodations, the legislature's intent is clear. "Sex" as used in the MHRA's prohibition of public accommodation discrimination is not meant to extend beyond biological sex.

Judge Wilson's dissenting opinion reaches the opposite conclusion based on an improper reading of the plain language definition of "sex" and a misplaced reliance on the United States Supreme Court case, *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 660 (2020).

First, the dissenting opinion asserts determining an individual's "sex" requires a complex mixture of many varied factors. Although the definition of sex may include morphological, physiological, and behavioral peculiarities, the second half of the definition clarifies each of these factors "subserve[] biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change." *Sex, Webster's Third New International Dictionary* (2002). Clearly, the sum of various biological traits that "subserve biparental reproduction are controlled "genetically" and "associated with special sex chromosomes[,]" defining "sex" as a biological concept, not as a socially constructed, subjective gender identity.

10

Second, the dissenting opinion relies heavily on *Bostock*'s statement: "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."  590 U.S. at 660.  The dissenting opinion's reliance on *Bostock* is wholly misplaced.  The dissenting opinion incorrectly assumes the Supreme Court's interpretation of the federal employment anti-discrimination provisions in Title VII is conclusive as to the MHRA's public accommodation provision.  Although this Court's review of cases arising under the MHRA is guided by both Missouri law and federal law, the federal law must be "***consistent with Missouri law***."  *Matthews*, 685 S.W.3d at 366 (emphasis added); *Lampley v. Mo. Comm'n on Hum. Rts.*, 570 S.W.3d 16, 22 (Mo. banc 2019); *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818 (Mo. banc 2007), *superseded on other grounds by* § 213.010(2), RSMo. Supp. 2017.  The MHRA prohibits discrimination in housing, employment, and places of public accommodation.  *See generally* section 213.010, *et seq*.  The Civil Rights Act of 1964 similarly prohibits discrimination in employment and public accommodations.[11]  In reviewing *employment* discrimination cases, this Court is, therefore, guided by federal *employment* discrimination cases. *Matthews*, 685 S.W.3d at 366 ("When reviewing cases under the MHRA, appellate courts are guided by both Missouri law and any ***federal employment*** discrimination (i.e., Title VII [of the Civil Rights Act of 1964]) case law that is consistent with Missouri law." (emphasis added) (alteration in original)).  In reviewing *public accommodation*

---

[11] Housing discrimination is prohibited federally by the Fair Housing Act.  42 U.S.C. §§ 3601, *et seq*.

discrimination cases, however, this Court is guided by federal *public accommodation* cases. *Bostock* is an employment discrimination case and specifically reserves judgment on cases involving public accommodations. *Bostock*'s holding, therefore, is not conclusive as to the meaning of "sex" regarding public accommodations under the MHRA. Much more persuasive is the General Assembly's enactment of the MHRA consistent with the plain, ordinary meaning of the term "sex" and its consistent rejection of efforts to amend the statute beyond this meaning.

The dissenting opinion's overreading of *Bostock* is plainly evident in *Bostock*'s express limitation, which the dissenting opinion acknowledges yet fails to consider in its analysis. The Supreme Court in *Bostock* specifically stated it did "not purport to address bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681. If such "compelling, inescapable logic" applies to the public accommodation provision in the MHRA, the Supreme Court's specific carve-out for restrooms and locker rooms would have been unnecessary and nonsensical. Central to the Supreme Court's analysis is that "[a]n individual employee's sex is not relevant to the selection, evaluation, or compensation of employees" and, additionally, "[a]n individual's homosexuality or transgender status is not relevant to employment decisions." *Id.* at 660 (internal quotations omitted). Here, no one disputes that restrooms may be lawfully separated based on sex.[12] As such, there must be a way to categorize sex-separated restrooms.

---

[12] In the context of sex discrimination, courts have long recognized the legitimacy of accounting for sex-specific differences because "[p]hysical differences between men and women … are enduring: '[T]he two sexes are not fungible; a community made up

12

Here, that categorization is based on sex. *See supra* note 12. *Bostock*, therefore, is distinguishable in that a person's sex is relevant to sex-separate restrooms. The dissenting opinion expands the holding of *Bostock* beyond that stated by the Supreme Court and contrary to the express limits on its holding articulated by the Supreme Court.[13] Whether Missouri should or should not extend *Bostock* to public accommodations under the MHRA is a decision for the General Assembly, the policy-making branch of our state government.

Only after determining the General Assembly's intended definition of "sex" under section 213.065, as a question of law, can the Court turn to the question of whether R.M.A. adduced evidence that R.M.A.'s male sex, as defined above, was a contributing factor in the School District's denial.[14] Applying the plain, original meaning of the word

---

exclusively of one [sex] is different from a community comprised of both.'" *United States v. Virginia*, 518 U.S. 515, 533 (1996) (second and third alteration in original) (quoting *Ballard v. United States*, 329 U.S. 187, 193 (1946)); *see also* 8 C.S.R. 60-3.040 (11) (requiring employers assure "appropriate physical facilities to both sexes"); 19 C.S.R. 30-85.012(32) (requiring certain nursing facilities provide employees "separate restrooms for each sex"); 20 C.S.R. 2085-12.010(4)(D) (requiring barber, cosmetology, and esthetician schools provide restrooms to "separately accommodate male and female students"). This is also a practice that has been approvingly recognized throughout history. *See generally Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 809 (11th Cir. 2022) (collecting cases); W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227, 229 (2019).

[13] Other states' courts have declined to follow *Bostock* when the underlying anti-discrimination law is distinguishable and, instead, rely on legislative intent. *See, e.g.*, *Doe v. Catholic Relief Servs.*, 300 A.3d 116, 128-30 (Md. 2023); *Vroegh v. Iowa Dep't of Corr.*, 972 N.W.2d 686, 702-703 (Iowa 2022); *State v. Loe*, 692 S.W.3d 215, 238 (Tex. 2024).

[14] Contrary to the dissenting opinions, the Court is not overriding the jury's role in deciding a question of fact. This Court is obligated to determine questions of law prior to

---

13

"sex" as used in section 213.065 demonstrates the circuit court's judgment is correct. Although R.M.A. argues the School District's consideration of genitalia is inherently sex-related, the only evidence adduced at trial was that the School District's decisions were based on the fact that R.M.A. had female genitalia.[15] Under the definition of sex described above, therefore, R.M.A. did not adduce evidence that R.M.A.'s *male sex* was a contributing factor in the alleged discrimination. To the contrary, the only evidence presented was that traits related to *female sex* motivated the School District's decision.[16] *See supra* note 12.

_____

sending questions of fact for jury consideration. Specifically, Judge Wilson's dissenting opinion offers an alternative interpretation of the definition of "sex," a term that was not defined in the instructions for the jury. All the evidence highlighted as sufficient for the case to go to the jury presumes a different definition of sex than the one this Court states in its duty to determine a question of law.

[15] Judge Wilson's dissenting opinion also believes the School District's refusal to allow R.M.A. to use the male-designated restroom after R.M.A. obtained an amended birth certificate demonstrates the School District's actions were pretext for its intent to discriminate. Section 193.215.9, however, states: "Upon receipt of a certified copy of an order of a court of competent jurisdiction indicating the *sex of an individual born in this state has been changed by surgical procedure* and that such individual's name has been changed, the certificate of birth of such individual shall be amended." (Emphasis added). The evidence adduced at trial demonstrated that R.M.A. had female genitalia and had not had gender confirmation surgery.

[16] For this same reason, there was no evidence adduced the School District engaged in sex stereotyping. *See Lampley*, 570 S.W.3d at 25 ("[A]n employee who suffers an adverse employment decision based on sex-based stereotypical attitudes of how a member of the employee's sex should act can support an inference of unlawful sex discrimination."). None of the evidence presented supported an inference the School District made its decision based on how R.M.A. presented as male or based on "stereotypical attitudes" of how a male "should act." *Id.* Instead, R.M.A. asserts the School District discriminated "because he does not meet the stereotypical notions of what it means to be male (i.e., because he has female genitalia)[.]" A person's biological sex, however, is not a stereotype. *See Adams*, 57 F.4th at 809 (finding, in a case decided after *Bostock*, that a bathroom policy separating bathrooms based on biological sex is not

14

Because there was no probative evidence the School District denied R.M.A. use of the male-designated restroom and locker room facilities because of R.M.A.'s male sex, JNOV was proper. Additionally, because this Court affirms the JNOV in the School District's favor, this Court need not address Point II concerning the circuit court's conditional grant of a new trial.

*Point III: Whether the jury instructions were improperly limited*

R.M.A. also argues the circuit court improperly granted the JNOV because its ruling was based on elements narrower than those section 213.065 requires. Specifically, R.M.A. argues the element regarding the factors in the School District's decision is not required to be based on R.M.A.'s "male sex." Instead, the element should have referred only to R.M.A.'s "sex." Such solution, however, would run afoul of the public accommodation protections of the MHRA and this Court's precedent. *See R.M.A. I*, 568 S.W.3d at 425 (finding R.M.A., "in substance if not in form," would have to prove R.M.A.'s "***male sex*** was a contributing factor in such denial" (emphasis added)).

R.M.A. also argues the element regarding public accommodations was overly limited because, instead of "males' restrooms and locker room facilities," R.M.A. merely had to prove R.M.A. received inferior access to "public facilities." Male restrooms and locker room facilities were the specific public facilities R.M.A. complained of and were

---

based on a stereotype and "does not depend in any way on how students act or identify"). Nor should this Court be persuaded to morph it into a stereotype. *See Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001) ("Mechanistic classification of all our differences as stereotypes would operate to obscure those misconceptions and prejudices that are real.").

sufficient to describe the public accommodations at issue. This Court finds the jury instructions were not improperly limited.

*Motion for Attorney Fees*

Before this case was submitted to the Court, R.M.A. filed a motion for attorney fees on appeal pursuant to section 213.111.2, and the Court ordered the motion taken with the case. Because the MHRA permits an award of attorney fees only to the prevailing parties, this Court overrules R.M.A.'s motion for attorney fees.

**Conclusion**

The circuit court's judgment sustaining the School District's motion for JNOV is affirmed.

_____
KELLY C. BRONIEC, JUDGE

Russell, C.J., Fischer, Ransom,
and Gooch, JJ., concur; Powell, J.,
dissents in separate opinion filed and
concurs in part in opinion of Wilson, J.;
Wilson, J., dissents in separate opinion filed.

16


R.M.A.,                                          )
                                                 )
    Appellant,                )
                                                 )
v.                                               )    No. SC100694
                                                 )
BLUE SPRINGS R-IV SCHOOL                         )
DISTRICT,                                        )
                                                 )
    Respondent.               )

## DISSENTING OPINION

Sharing many of the concerns raised by Judge Wilson, I join in his well-reasoned dissenting opinion. I write separately to explain the apparent inconsistency from my vote and legal reasoning in *R.M.A. ex rel. Appleberry v. Blue Springs R-IV School District*, 568 S.W.3d 420 (Mo. banc 2019) ("*R.M.A. I*"). In *R.M.A. I*, the school district and its board of education (collectively, "Defendants") filed a motion to dismiss for failure to state a claim upon which relief could be granted. *Id.* at 424. One of Defendants' grounds for dismissal was that the Missouri Human Rights Act ("MHRA"), which prohibits discrimination based on sex, does not cover claims based on gender identity. *Id.* The circuit court sustained Defendants' motion to dismiss, and this Court subsequently vacated the circuit court's ruling. *Id.* at 430. I joined Judge Fischer's sensible and straightforward dissenting opinion

in *R.M.A. I* because I agreed then – and still do – that the plain and ordinary meaning of the word "sex" refers to "the biological classification of individuals as male or female." *Id.* at 432 (Fischer, J., dissenting). Accordingly, the MHRA does not extend beyond biological sex to include claims of discrimination based on gender identity, as evidenced by the state legislature repeatedly declining to adopt bills seeking to amend the MHRA to prohibit discrimination based on a person's gender identity.[1]

While the MHRA does not prohibit discrimination based on gender identity, the evidence presented at R.M.A.'s trial went beyond such limited motivation. As the principal opinion notes, entering a judgment notwithstanding the verdict ("JNOV") is a drastic measure and should be granted only when "there is a complete absence of probative fact to support the jury's conclusion." *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007). R.M.A. claimed discrimination based on his "legal sex," which he

---

[1] Shortly after this Court decided *R.M.A. I*, the United States Supreme Court handed down *Bostock v. Clayton County, Georgia*, 590 U.S. 644 (2020), defining the term "sex" as used in Title VII of the Civil Rights Act of 1964 in the context of employment discrimination. There, the Supreme Court ruled "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660. The definition of "sex" as found by the Supreme Court, therefore, appears to encompass gender identity. The principal opinion correctly notes, however, that the federal statute at issue in *Bostock* relates to workplace discrimination and the state statute at issue here refers to discrimination in public accommodations. Moreover, *Bostock* went so far as to state its holding did "not purport to address bathrooms, locker rooms, or anything else of the kind." *Id.* at 681. Nonetheless, *Bostock* provides persuasive authority that discrimination based on sexual orientation and transgender status is unlawful discrimination based on "sex" under Missouri law. While I find the analysis in Justice Gorsuch's majority opinion far too reliant and focused on the literal – rather than ordinary – meaning of the word "sex," the Supreme Court's holding in *Bostock* unsettles my continued confidence in my position that sex refers solely to biological classifications and does not extend to gender identity.

maintained was male.  At trial, R.M.A. was able to present sufficient evidence to the jury that he was, in fact, discriminated against on the basis of his male sex and not solely on the basis of his gender identity or transgender status.  To cut to the chase, R.M.A. presented evidence he is both legally and biologically male, and the standard of review dictates this Court presume the jury believed that evidence – even if the circuit court did not.

The principal opinion reaches a different conclusion.  It finds "[t]he term 'legal sex' is a misnomer that may be more comparable with the term 'gender.'"  Slip op. at 9, n.10. When R.M.A. alleges discrimination based on his "legal sex," he is really making a gender-based discrimination claim rather than a claim rooted in biological sex.  And, because "sex" is defined as "a biological concept, not as a socially constructed, subjective gender identity," the principal opinion finds R.M.A. failed to establish a claim of discrimination under the MHRA.  Slip op. at 10.  While I agree with the principal opinion's definition of "sex," the evidence presented to the jury extended beyond evidence of "a socially constructed, subjective gender identity."  In addition to evidence that R.M.A. dressed and presented as male, the record reflects he is also male based on biological factors.

At trial, R.M.A. introduced evidence of his amended birth certificate, which supports the jury's finding that he is biologically male.  As the principal opinion notes, individuals in the state of Missouri are able to amend the sex designation on their birth certificates if certain criteria are met.  Section 193.215.9 states: "Upon receipt of a certified copy of an order of a court of competent jurisdiction *indicating the sex* of an individual born in this state *has been changed by surgical procedure* and that such individual's name

3

has been changed, the certificate of birth of such individual shall be amended."[2]  (Emphasis added).

In 2014, R.M.A. successfully petitioned for an order amending his birth certificate, and the state issued him an amended birth certificate listing his sex designation as "male." To change his sex designation, R.M.A. had to have "been changed by surgical procedure." A change by surgical procedure undoubtedly affects a person's biology.  The legislature's inclusion of this requirement in section 193.215.9 aligns with the principal opinion's proper determination that the legislature intended "sex" to refer to a person's biological sex.  It makes sense that the legislature, in enacting a statute allowing individuals to change their "sex" on a birth certificate, would require some sort of biological change, i.e., a change by surgical procedure.[3]

In addition to the birth certificate, R.M.A. presented significant other testimony and evidence that his biological sex is male, as detailed in Judge Wilson's dissenting opinion, that cannot be ignored.  Understandably, the principal opinion highlights that the jury was

---

[2] All statutory reference are to RSMo 2000 unless otherwise indicated.

[3] R.M.A. presented evidence he underwent surgery for a puberty-blocking implant.  A medical expert testified R.M.A. subsequently never developed breasts or had a menstrual cycle.  The principal opinion seemingly discounts this type of surgical procedure, noting "[t]he evidence adduced at trial demonstrated that R.M.A. had female genitalia and had not had gender confirmation surgery."  Slip op. at 14, n.15.  The plain language of section 193.215.9, however, does not specify the type of surgical procedure (beyond one that changes an individual's sex) or make mention of genitalia, nor does the principal opinion's provided definition of "sex" equate to an individual's genitalia alone.  Rather, the principal opinion defines sex as "the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change, that in its typically dichotomous occurrence is usu[ally] genetically controlled and associated with special sex chromosomes." *Sex*, *Webster's Third New International Dictionary* (2002).

4

also presented with evidence of R.M.A.'s female genitalia, or, in other words, evidence that R.M.A.'s biological sex was "female." This compelling and competing evidence undoubtedly complicates the analysis of whether R.M.A. was discriminated against based on his male sex. Genitalia certainly is significant and substantial evidence of a person's legal and biological sex, but it was the jury that had the indispensable and oftentimes unenviable role of deciding what evidence to believe, what weight to give that evidence, and what inferences to draw from that evidence. As the principal opinion explains, this Court must view the evidence "in the light most favorable to the jury's verdict, giving evidence consistent with the verdict the benefit of all reasonable inferences and disregarding evidence that conflicts with the verdict." Slip op. at 6. This Court may intervene "only whe[n] there is a complete absence of a probative fact to support the jury's conclusion." *Clevenger*, 237 S.W.3d at 590.[4]

The plain and ordinary meaning of the word "sex" refers to "the biological classification of individuals as male or female." At trial, R.M.A. presented sufficient evidence that his biological sex is and was male and Defendants discriminated against him

---

[4] Based on the evidence of R.M.A.'s genitalia, I certainly appreciate Defendants' predicament, but that cannot sway my consideration of the evidence presented at trial in light of the standard of review. It is "the duty of the [C]ourt to determine the law [] and apply it as the facts might be found by the jurors." *Cobb v. Griffith & Adams Sand, Gravel & Transp. Co.*, 87 Mo. 90, 94 (Mo. 1885). While I am sympathetic to the difficult and socially charged situation Defendants and others in their position may have faced or will face in the future, I am, nonetheless, bound to abide by this duty. Moreover, the Court's role is to interpret law – not enact it. It is the legislature, not the courts, that has the ability to change the law if it needs to be changed.

on the basis of his sex. Because there was sufficient evidence to support the jury's verdict, this Court should reverse the circuit court's grant of JNOV.[5]



W. Brent Powell, Judge

---

[5] Judge Wilson also found the circuit court erred in sustaining Defendants' alternative motion for a new trial. While I appreciate his position, I am not sure I would come to the same conclusion. Granting a new trial looks beyond whether the evidence was merely sufficient to make out a submissible case and, therefore, may be appropriate where JNOV is not. "It is well settled in Missouri that a circuit court has broad discretion to grant a new trial on the ground that the verdict is against the weight of the evidence, and its decision will be affirmed by an appellate court absent manifest abuse of that discretion." *Badahman v. Catering St. Louis*, 395 S.W.3d 29, 39 (Mo. banc 2013). In light of the evidence related to R.M.A.'s genitalia, I think the circuit court appropriately acted within its discretion when it assessed this evidence and determined the jury's verdict for R.M.A. was against the weight of the evidence.



# SUPREME COURT OF MISSOURI
## en banc

R.M.A.,                                    )
                                           )
    Appellant,                      )
                                           )
v.                                         )            No. SC100694
                                           )
BLUE SPRINGS R-IV SCHOOL                   )
DISTRICT,                                  )
                                           )
    Respondent.                     )

## DISSENTING OPINION

This case does not involve access to gender-affirming health care services, who should be allowed to play on what sports teams, or any of the myriad of difficult policy questions involving transgender people. Such questions of policy should be left to the general assembly as the policy-making branch. But the legislature cannot know what questions to solve or how unless and until the judiciary can be depended upon to steadfastly and predictably enforce the laws the legislature writes. The United States Supreme Court recently did so with respect to workplace discrimination under the Civil Rights Act of 1964, holding "it is **impossible** to discriminate against a person for being homosexual or transgender without discriminating against that individual **based on sex**." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 660 (2020) (emphasis added). Here,

the circuit court's action setting aside the jury's verdict failed in this primary object of enforcing the law.

The jury, after seeing the witnesses and hearing the evidence, found: (1) the Blue Springs School District (the "District") denied R.M.A. use of the males' restroom and locker room facilities at school; and (2) R.M.A.'s male sex was a contributing factor in the District's action. This constituted a violation of section 213.065.2 of the Missouri Human Rights Act ("MHRA"),[1] which makes it unlawful for the District to "deny any other person ... facilities, services, or privileges made available in any place of public accommodation ... or to segregate or discriminate against any such person in the use thereof *on the grounds of ... sex*[.]" (Emphasis added).[2]

The circuit court entered judgment for the District notwithstanding the jury's verdict ("JNOV").[3] In doing so, the circuit court improperly substituted its view of the

---

[1] All statutory references are to RSMo 2000 unless otherwise indicated.

[2] The jury further found the District's conduct was outrageous, either because of its evil motive or because it acted with reckless indifference to the rights of others.

[3] On December 13, 2021, the circuit court entered judgment following the jury trial and verdicts. The circuit court announced it would take up R.M.A.'s request for attorney fees and equitable relief separately. Under Rule 72.01(b), the District's motion for JNOV (if any) had to be filed "[n]ot later than thirty days after entry of judgment[.]" On January 12, 2022, 28 days later, the District filed its motion for JNOV or, in the alternative, for new trial. On May 27, 2022, the circuit court entered an amended judgment based on the jury's verdicts but added an award of attorneys fees and denied equitable relief. On that same day, the circuit court further amended the judgment sustaining the District's motions, both for JNOV and for new trial. By the time it was sustained, the District's JNOV motion had been pending for 166 days. Under Rule 78.06, "Any … motion for judgment notwithstanding the verdict is overruled for all purposes if the trial court does not rule on it within ninety days." This, alone, would justify reversing the circuit court's judgment sustaining the District's motion for JNOV.

2

facts for that of the jury, concluding: "The sole uncontradicted evidence at trial was that [R.M.A.] was excluded from the male facilities because of his female genitalia." The circuit court erred because it ignored other evidence supporting the jury's verdict. Even if the circuit court's assessment of the evidence were correct, however, the logic of *Bostock* dictates this evidence alone is sufficient to support the jury's findings. JNOV, therefore, was improper. Because the circuit court's judgment should be reversed and judgment entered based on the jury's verdict, I respectfully dissent.

## Background

In October 2014, R.M.A. filed a charge of discrimination with the Missouri Commission on Human Rights (the "Commission") alleging the District discriminated against him in a public accommodation on the grounds of his male sex. In July 2015, the Commission issued a notice of right to sue, terminating its administrative proceedings. R.M.A. then sued the District. His petition alleges he is male and, by denying him "access to the boys' restrooms and locker rooms," the District violated section 213.065.2 by discriminating against him in the use of a public accommodation "on the grounds of his sex."

In November 2015, the District filed a motion to dismiss for failure to state a claim upon which relief could be granted. The circuit court sustained that motion. On appeal, however, this Court vacated the circuit court's judgment and held R.M.A.'s petition alleged facts sufficient to state a claim under the MHRA. *R.M.A. ex rel. Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 426-28 (Mo. banc 2019) ("*R.M.A. I*"). On

3

remand, the circuit court held a jury trial. The jury found the District committed sex discrimination and awarded R.M.A. compensatory and punitive damages.

The District filed a motion for JNOV or, in the alternative, a motion for new trial. The District argued R.M.A. failed to make a submissible case for sex discrimination, or, alternatively, the jury's verdict was against the weight of the evidence. The circuit court sustained the District's motion for JNOV and conditionally granted a new trial. The only basis for these decisions was the circuit court's conclusion: "The sole uncontradicted evidence at trial was that [R.M.A.] was excluded from the male facilities because of his female genitalia."

### Standard of Review

Juries play an indispensable and constitutionally protected role in deciding what evidence to believe, what weight to give that evidence, and what inferences to draw from that evidence. To protect this role, JNOV may be granted only "when there is a ***complete absence*** of probative fact to support the jury's conclusion." *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 769 (Mo. banc 2010) (emphasis added). "A JNOV is a ***drastic*** action that can only be granted if reasonable persons cannot differ on the disposition of the case." *Ark.-Mo. Forest Prod., LLC v. Lerner*, 486 S.W.3d 438, 447 (Mo. App. 2016) (emphasis added). Accordingly, unlike ordinary trial errors, appellate courts indulge "a presumption favoring the reversal of a JNOV[.]" *Id*.

The circuit court may reject a jury's verdict and enter a JNOV only when there is a complete absence of legal and substantial evidence to support one or more of the essential elements of the claim. *Newsome v. Kan. City, Mo. Sch. Dist.*, 520 S.W.3d 769, 775 (Mo.

4

banc 2017). "Substantial evidence is evidence which, if true, is probative of the issues and from which the jury can decide the case." *Hayes v. Price*, 313 S.W.3d 645, 650 (Mo. banc 2010) (internal quotations omitted).

To evaluate whether there is sufficient evidence to preclude a JNOV, the circuit court (and this Court on appeal) are bound to "view[] all evidence in the light most ***favorable*** to the jury's verdict and draw[] all reasonable inferences in the plaintiff's favor." *Tharp v. St. Luke's Surgicenter-Lee's Summit, LLC*, 587 S.W.3d 647, 652 (Mo. banc 2019) (emphasis added). This is true even if the court does not believe the evidence or would not give it substantial weight. Finally, the circuit court (and this Court on appeal) are obligated to "***disregard*** all conflicting evidence and inferences, no matter how compelling it may find them." *Id.* (emphasis added).

Discrimination cases "are inherently fact-based and often depend on inferences rather than on direct evidence." *Lampley v. Mo. Comm'n on Hum. Rts.*, 570 S.W.3d 16, 22 (Mo. banc 2019) (plurality op.); *see also Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 588 (Mo. banc 2013) (stating discrimination cases "are inherently fact-based and often depend on inferences rather than on direct evidence" (quoting *Hill v. Ford Motor Co.,* 277 S.W.3d 659, 664 (Mo. banc 2009)). To provide the jury a reasonable basis for such inferences, a plaintiff claiming discrimination "generally must rely on circumstantial evidence." *Cox v. Kan. City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 116 (Mo. banc 2015). Because the jury plays a central role in deciding whether and what inferences to draw from the circumstances presented, it is seldom appropriate for a circuit court to decide discrimination cases "as a matter of law," i.e., by summary judgment,

5

directed verdict, or JNOV. *Cf. Farrow*, 407 S.W.3d at 588 ("Summary judgment seldom should be used in employment discrimination cases, because such cases are inherently fact-based and often depend on inferences rather than on direct evidence."); *Hill,* 277 S.W.3d at 664 (same).

## Analysis

The jury was instructed it must find for R.M.A. if it believed from the evidence: (1) the District denied R.M.A. the full and equal use and enjoyment of the males' restroom and locker room facilities at the District's school; (2) R.M.A.'s male sex was a contributing factor in such denial; and (3) R.M.A. suffered damage as a direct result of the District's conduct. Sufficient evidence supported each of these elements.

### I.      The District denied R.M.A. use of the males' restroom and locker room

The jury heard evidence from R.M.A., his parents, and the District's witnesses describing R.M.A.'s repeated requests to be allowed to use the males' restroom and locker room along with the other males, and the District's refusal to permit it. Accordingly, the evidence was sufficient for the jury to find R.M.A. was denied use of the males' restroom and locker room, and neither the circuit court nor the District on appeal contends otherwise.

### II.     R.M.A. was damaged by the District's discriminatory conduct

As with the previous element, neither the circuit court nor the District on appeal contends there was insufficient evidence for the jury to find R.M.A. was damaged by the District's discriminatory conduct. By making R.M.A. use the nurse's restroom or other isolated area to change for physical education class, extracurricular sports, or merely to

6

relieve himself, the District ostracized R.M.A. at a time in life when young people generally, and R.M.A. in particular, just want to fit in. There was no evidence any of the other males objected to R.M.A. using the males' restroom and locker room or that allowing him to do so would cause any harm to anyone. The District's unlawful attachment to sex stereotyping created a problem where none otherwise existed, and then ensured R.M.A. paid the price for "solving" it. The District's discriminatory actions emblazoned on R.M.A. a metaphorical "scarlet T" when all he wanted to do was fit in with the other males in his class. The District's actions continuously focused on what was different about R.M.A., highlighting how he was different from the other boys, and isolating him from his teammates when he joined the football team. The District embarrassed and humiliated R.M.A. and the jury's finding these actions harmed R.M.A. was amply supported by the evidence.

### III. R.M.A.'s male sex was a contributing factor in the District's discriminatory conduct

The circuit court overrode the jury's verdict for R.M.A. and entered JNOV for the District based on a single conclusion, i.e., that "[t]he sole uncontradicted evidence at trial was that [R.M.A.] was excluded from the male facilities because of his female genitalia." This pronouncement fails to justify the circuit court's JNOV for several independent reasons.

First, buried in this statement is the circuit court's refusal to credit the jury's determination that R.M.A., is male, or – more precisely – the court's conviction that a male cannot have genitalia normally associated with a female. This implied premise was

7

not lost on the principal opinion, which addresses it directly: "The School District claims, and the circuit court found, the only evidence adduced demonstrated the School District denied R.M.A. use of the male restrooms because of his *female* sex, not his *male* sex and, thus, R.M.A. failed to make a submissible case[.]" Slip op. at 7 (emphasis in original). The circuit court erred, however, because there was sufficient evidence R.M.A. is male, and the jury must be presumed to have believed that evidence.

Second, the circuit court ignored both the record and the standard of review applicable to JNOV motions when it declared the "sole uncontradicted evidence" was the District discriminated on the basis of R.M.A.'s genitalia and not his sex. There was more than enough other evidence from which the jury could find R.M.A.'s male sex was a contributing factor in the District's discriminatory conduct. The District's shifting justifications for its actions were pretextual, and such subterfuges give rise to an inference of unlawful discrimination. There also was sufficient evidence for the jury to find the District was forcing R.M.A. (and all of his classmates) to abide by its sex stereotypes, i.e., the District's ideas of what does and does not constitute the "right kind" of male. And, even if the circuit court were correct and the only evidence in this case showed the District discriminated against R.M.A. because of his genitalia and not his sex, the jury could still reasonably find – from that evidence alone – that R.M.A.'s male sex was a contributing factor in the District's discriminatory conduct. *See Bostock*, 590 U.S. at 660 (holding "it is *impossible* to discriminate against a person for being homosexual or transgender without discriminating against that individual *based on sex*" (emphasis added)).

8

## A. R.M.A. is male

Not only was there "sufficient" evidence for the jury to find R.M.A. is male; ***all*** the evidence in this case proves that fact. He says he is male, and the jury believed him. That should be enough, but there was more. R.M.A.'s birth certificate says he is male,[4] and the jury presumably believed that evidence. R.M.A.'s treating physician ("Dr. J.J."), a professor of pediatrics and attending physician in pediatric endocrinology, testified R.M.A. was male not once, but over and over. She testified genitalia does not necessarily determine a person's sex, and it does not do so in R.M.A.'s case. She testified R.M.A. was male at the time of trial and throughout the 12 years she had been treating him. The jury did not have to believe her, but it did. Any one of these facts constitutes substantial and competent evidence R.M.A. is male. As a result, the totality of this evidence was sufficient for this case to go to the jury.

The District insists R.M.A. cannot be male because he has genitalia normally associated with females. The circuit court seemingly agreed. But the jury heard the evidence and disagreed, and there is no basis for rejecting its conclusion. The circuit court may not have agreed, but circuit and appellate courts do not get to decide fact questions in jury cases. For example, one may not believe a given chemical compound

---

[4] Originally, R.M.A.'s birth certificate stated he was female, but he had it changed as the legislature provided he could do. *See* § 193.215.9 ("Upon receipt of a certified copy of an order of a court of competent jurisdiction indicating the sex of an individual born in this state has been changed by surgical procedure and that such individual's name has been changed, the certificate of birth of such individual shall be amended.").

9

caused a plaintiff's cancer, but, if an expert is permitted to opine on that question, the jury has a right to believe that evidence and return a verdict based upon it.

Section 213.065 says nothing about genitalia. It prohibits discrimination on the grounds of sex. Sex is necessarily biological, so to insist on the phrase "biological sex" is redundant. The estimable dictionary relied upon in the principal opinion confirms this by defining sex as one of two classes, male and female. *Sex*, *Webster's Third New International Dictionary* (2002). But it goes on to define sex as "the ***sum*** of the morphological, physiological, ***and*** behavioral peculiarities that subserve[] biparental reproduction with its concomitant genetic segregation and recombination which underlie ***most*** evolutionary change that in its ***typically*** dichotomous occurrence is ***usu[ally]*** genetically controlled and associated with special sex chromosomes." *Id*. (emphasis added). In other words, the dictionary reaches the same conclusion Dr. J.J. did in her testimony, i.e., that assigning a sex involves a complex mixture of many varied factors, no one of which controls over all the others. Sex includes morphology but also includes physiology and behavioral peculiarities. What the dictionary does not say, what no witness testified to or treatise in evidence states, and what no statute or judicial decision provides, is that a person's sex is always and only determined by that person's genitalia. Accordingly, the jury was allowed to decide – and did decide – R.M.A. is (and, at all times material to this action, has been) male.

10

**B.      R.M.A.'s male sex was a contributing factor in the District's discriminatory conduct**

The only remaining question is whether R.M.A.'s male sex, which the jury was allowed to and did find, played any role in the District's discriminatory conduct.  Other than the rare cases when a defendant accidentally or unadvisedly says the quiet part out loud (as the District did here), this element nearly always must be proved with circumstantial evidence giving rise to a reasonable inference of unlawful discrimination. *Cox*, 473 S.W.3d at 116.  Here, there was sufficient evidence of pretext for the jury to draw such an inference.  Alternatively, a plaintiff can prove unlawful discrimination by showing the defendant engaged in sex stereotyping.  There was sufficient evidence to show the District discriminated against R.M.A. because he did not comply with the District's stereotypical idea of what males should be.  The jury was entitled to draw an inference of sex discrimination from that fact.  Finally, this is one of the rare cases because the District admitted unlawful discrimination – proudly and repeatedly – by insisting it discriminated against R.M.A. solely because he was transgender, i.e., because he presented as male but with female genitalia, rather than because of his sex.  Any effort to discriminate against a male on the basis of having genitalia normally associated with females is – by that fact alone – unlawful discrimination on the basis of sex.  *Bostock*, 590 U.S. at 660 (holding "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex").

11

### 1.    Pretext

When R.M.A.'s parents approached the District and asked that R.M.A. be allowed to use the males' restroom and locker room, the District stated it treated students on the basis of the sex identified on their birth certificates.  But when R.M.A. produced his birth certificate showing he is male, the District refused to allow him to share the males' restroom and locker room with the other males.  From these facts, alone, the jury was permitted to – and the standard of review requires this Court to assume the jury did – conclude the District's claimed reliance on birth certificates was a pretext to obscure its intent to discriminate on the basis of sex.  *Cf. Button v. Dakota, Minn. & E. R.R. Corp.*, 963 F.3d 824, 833 (8th Cir. 2020) (noting "pretext may be proven, among other ways, by showing an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision" (quotation omitted)).

Similarly, the District claimed at trial it discriminated on the basis of R.M.A.'s female genitalia, suggesting it sorted students with respect to restroom and locker room usage based on their genitalia.  As discussed below, the District did not discriminate against R.M.A. because he had female genitalia; it did so because he was ***male*** with female genitalia, which the United States Supreme Court declared necessarily constitutes sex discrimination.  But the District's second explanation – like its first – also was untrue. The District never sought to verify R.M.A.'s genitalia, let alone the genitalia of every student in its care.  The District did not require R.M.A. to use the females' restroom and locker room, which its supposed genitalia-based system would have required.  Instead, it

12

declared, in essence, that R.M.A. was too male for the females' restroom but not male enough for the males' restroom. As a result, the District forced R.M.A. to live every day on a humiliating, ostracizing island. From these facts, the jury also was entitled to infer the District's claim that it discriminated only on the basis of genitalia was a pretext to obscure its intent to discriminate against R.M.A. on the basis of his sex.

Both of the District's supposed policies were untrue, and either gave the jury a reasonable basis to infer the District discriminated on the grounds of R.M.A.'s sex. *Buchheit, Inc. v. Mo. Comm'n on Hum. Rts.*, 215 S.W.3d 268, 278 (Mo. App. 2007) ("[A]n inference of discrimination may sometimes arise without additional evidence where the overall strength of the prima facie case and the evidence of pretext suffices to show intentional discrimination." (alternation in original) (quotation omitted)). Accordingly, either of them is sufficient to reverse the circuit court's decision sustaining the District's motion for JNOV.

## 2. Sex stereotyping

The District believes all males must have typically male genitalia and all females must have typically female genitalia. The evidence in this case proves this is not true for everyone and it is not true for R.M.A. But the District's treatment of R.M.A. was not based on evidence. The District never sought advice from anyone who might know anything about this subject, let alone anyone who might tell the District its view of the world was incorrect. Instead, the District decided solely on the basis of its uninformed and incorrect understanding of biology that R.M.A. – who is male and has genitalia

13

usually associated with a female – was not male enough to use the males' restroom and locker room. This is as plain a case of sex stereotyping as one can imagine.

"Stereotyping may give rise to an inference of unlawful discrimination upon a member of a protected class." *Lampley*, 570 S.W.3d at 24; *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989), *superseded by* 1991 Civil Rights Act §107. "[T]he MHRA does not provide for 'types' of sex discrimination claims; a claim is either a claim of sex discrimination or it is not." *R.M.A. I*, 568 S.W.3d at 426 n.4. "Rather than a 'type' of sex discrimination claim, 'sex stereotyping' merely is one way to ***prove*** a claim of sex discrimination, i.e., 'sex stereotyping' can be evidence of sex discrimination." *Id.* (emphasis in original); *see also Price Waterhouse*, 490 U.S. at 235 (holding discrimination against a woman because she was not feminine enough is sex discrimination); *Self v. Midwest Orthopedics Foot & Ankle*, 272 S.W.3d 364, 371 (Mo. App. 2008) (holding sex discrimination may be proved by showing a gender-related trait such as pregnancy played a factor in the defendant's conduct).

The jury was entitled to infer from the evidence the District discriminated against R.M.A. on the basis of its sex stereotypes; therefore, the District discriminated against R.M.A. on the grounds of his sex.

### 3. The district's concession

The District not only sought to hide its sex discrimination behind various pretexts and by invoking its stereotypes as to what males are and are not allowed to look like (including what genitals they are and are not allowed to have), but the tentpole of the District's entire defense is its assertion that it discriminated against R.M.A. on the basis

14

of his genitalia and not his sex. This assertion, by itself, is not only sufficient to raise an inference of sex discrimination (an inference the standard of review requires this Court to assume the jury drew), it is precisely the kind of assertion that the United States Supreme Court held gave rise to an inference of sex discrimination so clear and certain there was no need to ask a jury to draw it. *Bostock*, 590 U.S. 683 (reversing and holding summary judgment on the basis of sex discrimination was proper when the employer said it intended to discriminate against a person because she was transgender, not because of her sex).[5]

The District's justification is so often and so boldly repeated, its truly offensive and staggeringly inculpating character might be missed. By removing the lightning rod reference to transgender, however, that character becomes unmistakable. For example, like the relationship between genitalia and sex, skin color may bear an occasional relationship to race generally, but no reasonable person thinks it is dispositive – by itself – in determining a particular person's race. If the District tried to justify refusing to let an African American male student use the males' restroom or locker room by claiming it was discriminating only against his skin color, not his race, any reasonable juror would say this proved race discrimination. Indeed, one would hope this Court would draw that inference as a matter of law like the Supreme Court did in *Bostock*. This logic is why the Supreme Court held, shortly after *R.M.A. I* was decided:

---

[5] *See Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 818 (Mo. banc 2007) (holding, under the MHRA, "appellate courts are guided by both Missouri law and federal employment discrimination caselaw that is consistent with Missouri law").

An individual's homosexuality or transgender status is not relevant to employment decisions. That's because ***it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex***.[6]

*Id*. at 660 (emphasis added).  Writing for the Supreme Court, Justice Gorsuch explained:

[H]omosexuality and transgender status are ***inextricably bound up with sex***.  Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because ***to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex.***

*Id*. at 660-61 (emphasis added).

The Supreme Court made clear, again and again, it was not holding the defendant engaged in discrimination on the basis of transgender status, but that discrimination on the basis of transgender status necessarily entails discrimination on the basis of sex.

[I]ntentional discrimination based on sex violates Title VII, even if it is intended only as a means to achieving the employer's ultimate goal of discriminating against homosexual or transgender employees.  There is simply no escaping the role intent plays here: Just as ***sex is necessarily a but-for cause when an employer discriminates against homosexual or transgender employees***, an employer who discriminates on these grounds ***inescapably intends to rely on sex*** in its decisionmaking.

---

6   It is worth noting the Supreme Court refused to take the bait regarding the meaning of "sex," holding it was an immaterial distraction:
But because ***nothing in our approach to these cases turns on the outcome of the parties' debate***, and because the employees concede the point for argument's sake, we proceed on the assumption that "sex" signified what the employers suggest, referring only to ***biological distinctions*** between male and female.
*Bostock,* 590 U.S. at 655 (emphasis added).  By the same token, it is sufficient in this case to use the dictionary definition that "sex" is the "sum of the morphological, physiological, and behavioral peculiarities" separating humans into males and females.  Neither this meaning nor any other will change the analysis in *Bostock* and the inescapable inference the District discriminated on the basis of R.M.A.'s sex.

16

*Id.* (emphasis added).

Noting it had long held one cannot discriminate against someone merely for being the "wrong kind" of male or not being "female enough" i.e., discrimination based on sex stereotyping the Supreme Court held the inference of sex discrimination is even stronger when one discriminates against a homosexual or transgender person.

> [T]hese cases involve no more than the straightforward application of legal terms with plain and settled meanings. For an employer to *discriminate against employees for being homosexual or transgender*, the employer must *intentionally discriminate against individual men and women in part because of sex*. That has always been prohibited by Title VII's plain terms—and that should be the *end of the analysis*.

*Id.* at 662 (emphasis added) (quotation omitted).

After reviewing its sex discrimination precedent, the Supreme Count summarized those cases and their application to claims of sex discrimination by homosexual or transgender plaintiffs:

> First, *it's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it* …. [J]ust as labels and additional intentions or motivations didn't make a difference in [prior cases], they cannot make a difference here. *When an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex. And that is all Title VII has ever demanded to establish liability.*
>
> Second, the plaintiff's sex need not be the sole or primary cause of the employer's adverse action …. [I]t has *no significance* here if another factor – such as the sex the plaintiff is attracted to *or presents as* – might also be at work, or even play a more important role in the employer's decision.
>
> Finally, an employer cannot escape liability by demonstrating that it treats males and females comparably as groups …. [A]n employer who intentionally fires an individual homosexual or transgender employee in

17

part because of that individual's sex violates the law ***even if the employer is willing to subject all male and female homosexual or transgender employees to the same rule.***

*Id*. at 664-65 (emphasis added).

Rejecting the employers' claims they never understood that discriminating against a transgender person necessarily involved sex discrimination, the Supreme Court held:

> What, then, do the employers mean when they insist intentional discrimination based on homosexuality or transgender status isn't intentional discrimination based on sex? ... [T]he employers may mean that they don't perceive themselves as motivated by a desire to discriminate based on sex. But nothing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination.

*Id*. at 667-68.

Rejecting the argument that a willingness to discriminate against all homosexuals of either sex, or all transgender individuals regardless of the sex they were assigned at birth or the one they present as now, somehow proves a lack of discrimination on the ground of sex, the Supreme Court held:

> [T]here is ***no way an employer can discriminate against those who check the homosexual or transgender box without discriminating in part because of an applicant's sex*** …. By discriminating against transgender persons, ***the employer unavoidably discriminates against persons with one sex identified at birth and another today.*** Any way you slice it, the employer intentionally refuses to hire applicants in part because of the affected individuals' sex, even if it never learns any applicant's sex.

*Id*. at 669 (emphasis added).

Rejecting the argument that discriminating against homosexuals or transgender persons cannot be illegal even if it necessarily involves discrimination on the grounds of

18

sex because Congress did not include homosexual or transgender status as protected classes in the Civil Rights Act of 1964, the Supreme Court held:

> ***We agree that homosexuality and transgender status are distinct concepts from sex.*** But, as we've seen, discrimination based on homosexuality or transgender status ***necessarily entails*** discrimination based on sex; ***the first cannot happen without the second*** ….  As enacted, Title VII prohibits all forms of discrimination because of sex, however they may manifest themselves or whatever other labels might attach to them.

*Id*. at 669-70 (emphasis added).[7]

The Supreme Court saw through the very same argument the District claims should prevail in this case, i.e., that the District discriminated on the grounds of R.M.A.'s genitalia and not his sex.  The jury disbelieved the District's justification, as it was entitled to do.  But, even if the jury believed the District's claim, *Bostock* explains discriminating against a transgender person, i.e., someone who is one sex but has genitalia or other characteristics usually associated with the other sex, ***is*** discriminating on the grounds of sex.  Inescapably.  The former ***necessarily*** entails the latter.  At the very minimum, a jury would be allowed to draw the inference *Bostock* declares courts must draw as a matter of law.  The standard of review requires an assumption the jury

---

[7]  Obviously, *Bostock* concerned discrimination against a transgender person by her employer in violation of Title VII, not a school district prohibiting a male transgender student from using the males' restroom and locker room in violation of the MHRA.  590 U.S. at 681 (stating "we do not purport to address bathrooms, locker rooms, or anything else of the kind").  But the Supreme Court was not construing any particular statutory language or expounding on some obscure point of federal law.  Instead, it was highlighting the ***factual*** inference of sex discrimination that arises inescapably from acts of discrimination aimed at transgender people, i.e., people of one sex who have some characteristics (including, on occasion, genitalia) usually associated with the other sex.  This compelling, inescapable logic applies every bit as much to the MHRA as it does to Title VII of the Civil Rights Act of 1964.

19

drew this inference; therefore, even if the circuit court were correct that the only evidence showed the District discriminated on the basis of R.M.A.'s genitalia, this was sufficient to justify the jury's conclusion the District discriminated on the basis of his sex.

## Conclusion

For the reasons set forth above, I would reverse the circuit court's grant of JNOV, leaving in effect the May 27, 2022, judgment based on the jury's verdicts.[8]  Accordingly, I respectfully dissent.

_____

Paul C. Wilson, Judge

---

[8]  In addition to sustaining the District's motion for JNOV, the circuit court sustained the District's alternative motion for a new trial.  The problem, and it is a fatal one, is that the circuit court sustained the new trial motion on the same erroneous grounds on which it sustained the JNOV motion, i.e., that R.M.A. failed to make a submissible case because the only evidence was the District discriminated against R.M.A. based on his genitalia and not his sex.  "The law is well established that if the plaintiff makes a submissible case, an order granting a new trial to the defendant after a verdict for the plaintiff for the reason that the plaintiff failed to make a submissible case would be arbitrary and an abuse of discretion." *Brooks v. SSM Health Care*, 73 S.W.3d 686, 691 n.5 (Mo. App. S.D. 2002) (citing *Lifritz v. Sears, Roebuck & Co.*, 472 S.W.2d 28, 33 (Mo. App. 1971)).  Accordingly, I would vacate the circuit court's order sustaining the alternative motion for new trial.

20